UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| PAC-VAN, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-341 |
| | § | |
| CHS, INC. D/B/A CHS | § | |
| COOPERATIVES, | § | |
| | § | |
| Defendant. | | |

## MEMORANDUM AND ORDER

This insurance dispute turns on the following question: when a company agrees to purchase "commercial general liability insurance" that lists another entity as an additional insured, must the insurance provide primary coverage?

## I.  BACKGROUND[1]

Plaintiff Pac-Van Inc., a company that leases and sells portable buildings for nonresidential use, leased a work trailer to Defendant CHS, Inc. CHS is involved in several businesses, including the importation and shipment of fertilizers to consumers.  The leased Pac-Van trailer was being used as a temporary office building at CHS's Galveston location when one of CHS's employees, Charles Vastine, fell through a soft spot on the floor of the trailer and injured himself.

---

[1] As the cross motions for summary judgment filed by the parties acknowledge, there is no dispute as to the relevant facts of this case. The sole issue before the Court is how to interpret the parties' contract.

1

Though the Texas workers' compensation regime barred Vastine from suing CHS, Vastine sued Pac-Van for his injuries.  Docket Entry No. 1 at 22.  Pac-Van and its insurance carrier, Hanover Insurance Company, gave CHS notice of the lawsuit and demanded that CHS defend Pac-Van pursuant to the parties' Master Services Agreement.  CHS and its insurance carrier, Liberty Mutual Insurance, refused.

> The relevant provision of the Agreement provides:
>
> INSURANCE: [CHS], at its own expense, shall insure for risks of loss or damage. [CHS] must carry commercial general liability insurance insuring both [Pac-Van] and [CHS] against loss. The general liability insurance amounts must not be less than $1,000,000 bodily injury per person, $1,000,000 bodily injury per occurrence, $1,000,000 property damage per occurrence, and [Pac-Van] must be named as an additional insured.

Docket Entry No. 12-1 at 3.  The insurance policy that CHS purchased from Liberty Mutual Insurance named Pac-Van as an additional insured and had a per-occurrence limit of $1 million, but its coverage would not kick in at the low level of exposure involved in Vastine's case.[2]  Instead, it was an "excess" policy: the additional insured provision stated that "insurance provided to the Additional Insured is excess over the 'self-insured amount.'"  Docket Entry No. 15-2 at 44.  That self-insured amount was $2 million, meaning that Pac-Van was required to cover the first $2 million relating to any occurrence, and then Liberty would be on the hook for any liability in the $2–3 million dollar range.

---

[2] As part of its breach of contract claim, Pac-Van alleges that CHS did not provide Pac-Van with a Certificate of Insurance, which was required under the parties' agreement and would have alerted Pac-Van to the policy CHS purchased prior to Vastine's lawsuit.

2

After CHS declined Pac-Van's tender to provide a defense, Pac-Van settled the Vastine lawsuit for $172,500.00. Pac-Van then filed a breach of contract claim in state court that CHS removed to this Court on diversity grounds. Both parties view the contract as unambiguous and accordingly have brought competing summary judgment motions.[3]

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.   ANALYSIS

### A. Contract Interpretation

Absent ambiguity, the Court must interpret the contract at issue as a matter of law. *Amtech Elevator Servs. Co. v. CSFB 1998–P1 Buffalo Speedway Office*

---

[3] CHS also moved for summary judgment on Pac-Van's claims for indemnity, contribution and negligence. During the Docket Call held on December 3, 2013, Pac-Van conceded that CHS was entitled to summary judgment on those claims. Accordingly, the Court orally granted summary judgment in favor of CHS on all claims except for breach of contract.

3

*Ltd. P'ship*, 248 S.W.3d 373, 379 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Id.* (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Id.* (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Terms in a contract are given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The Court presumes "that the parties to a contract intend every clause to have some effect." *Id.* In construing a contract, the court's primary purpose is always to ascertain the true intent of the parties as expressed in the written instrument. *State Farm Mut. Auto. Ins. Co. v. Scott*, 866 F. Supp. 2d 680, 686 (S.D. Tex. 2012).

### B. Does "Commercial General Liability Insurance" Mean a Primary Policy?

The question in this case is whether CHS breached the parties' Master Services Agreement when it purchased an excess policy that would not provide any coverage until Pac-Van or its insurer had expended $2 million defending an underlying suit. CHS's argument is that it complied with the Agreement because

4

the Agreement did not explicitly require CHS to purchase a primary policy. In other words, absent contractual language stating that CHS must provide "*primary* commercial general liability insurance," CHS takes the position that it could have purchased a policy providing $1 million of coverage at any layer.

In support of this position, CHS's principally relies on three Texas cases, all from the First Court of Appeals in Houston, which it reads as requiring a contract to say "primary" if primary coverage is required. *See* Docket Entry No. 15 at 6 ("Texas courts do not impose a duty on contracting parties to obtain a particular type of [commercial general liability] policy unless the parties specify the desired policy, terms, and coverage limits in their contract."). A careful review of those decisions does not persuade the Court that Texas law requires a primary designation in this situation.

The first case is *Phillips Petroleum Co. v. St. Paul Fire & Marine Ins. Co.*, 113 S.W.3d 37 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Phillips hired Zachry to perform maintenance work at its facilities. In a services agreement, Zachry agreed to name Phillips as an additional insured in a "commercial general liability insurance policy" with a "limit of $1,000,000 per occurrence" that "shall be written or endorsed to be primary," *id.* at 41—language that is lacking from the agreement between CHS and Pac-Van. When Zachry employees brought suit against Phillips after suffering injuries at its facility, Zachry's insurer provided a

defense. But Zachry's insurer argued that its obligations were complete once it expended $1 million defending Phillips because Zachry purchased a "fronting" policy. The court rejected Phillips' argument that the services agreement required Zachry to purchase "traditional" insurance, that is, one "whose limits were exhausted only upon the payment of settlements or judgments," rather than payment of litigation expenses. *Id.* at 43. The court explained that "other than the limits of coverage required, the [contract] does not expressly specify the type of commercial general liability coverage that Zachry was required to purchase." *Id.* Two aspects of *Phillips* thus can be read as supporting CHS's position: 1) the contract between the businesses specified that the policy would be primary and that language is not present in the Pac-Van/CHS agreement; and 2) the court's ruling, though on an issue unrelated to whether insurance must be primary, relied on the principle that a court should not require "the insertion of terms into the policy which are not contained in the [contract] itself." *Id.* at 44.

But the parties in the next case, *Gilbane Bldg. Co. v. Keystone Structural Concrete*, 263 S.W.3d 291, 299 (Tex. App.—Houston [1st Dist.] 2007, no pet.), treated the "commercial general liability" term in their agreement as providing for a primary policy even though the agreement did not so specify. In that case, Gilbane, the contractor, required Keystone, its subcontractor, to purchase "Commercial General Liability to be provided on a [$1 million] 'occurrence'

6

basis." *Id.* In a different paragraph, it required that Keystone purchase "Excess Umbrella Liability, to provide insurance in excess of Employers' Liability, Commercial General Liability, and Automobile Liability policies required hereunder: $5,000,000 each occurrence and $5,000,000 general policy aggregate." *Id.* After a lawsuit against Gilbane settled for $2 million, Keystone covered the first $1 million under its commercial general liability policy but did not cover the second $1 million because it contended that its "Excess Umbrella Liability" policy applied only after the exhaustion of Gilbane's own primary insurance coverage. The court accepted that argument, noting that to interpret the contract in Gilbane's favor the court "would have to add a provision stating that the umbrella policy would be primary to Gilbane's insurance." *Id.* This holding—which CHS relies on for its argument that an agreement must say "primary" for primary coverage to be required—is unremarkable when read in context. The Court was deciding whether the excess layers of the policy listing the additional insured should be primary to that additional insured's own policy providing primary coverage—a counterintuitive proposition that would understandably require that level of specification to overcome the ordinary understanding that an excess policy would only kick in after the exhaustion of all primary coverage. *See also Liberty Mut. Ins. Co. v. CB Richard Ellis, Inc.*, 242 F. App'x. 32, 36–37 (4th Cir. 2007) (noting that the court would not infer that the

parties intended for one commercial general liability policy to be primary to another such policy when both covered a particular claim). And Pac-Van can draw support from Keystone's conduct in complying with its obligation to provide a "commercial general insurance policy" by providing the initial $1 million layer of coverage.

Pac-Van can also find some support in the final case, *Amtech*, 248 S.W.3d. 373. Amtech, the servicing company which had agreed to provide "comprehensive liability insurance" with a $1 million limit to the owner of the property where it was performing work, purchased a "fronting policy" like the one at issue in *Phillips*. However, unlike in *Phillips*, Amtech refused to reimburse the insurer for amounts expended under the fronting policy when a lawsuit was brought against the property owner. Amtech's position was that it had fulfilled its obligation by obtaining a comprehensive general liability policy (with $1 million per occurence limits) that listed the property owner as an additional insured, despite the fact that the property owner had to pay the $1 million reimbursement and thus ended up receiving no coverage at all. The court held that "by obtaining a fronting policy that did not provide coverage within the limits of the policy at no cost to [the property owner], when the contract required a policy adequate to protect the interests of the parties, Amtech breached its contractual obligations." *Id.* at 381.

One thing is clear from these decisions. None addresses the precise issue presented here: whether a requirement to provide a "general commercial liability policy" means a primary policy. Though the parties in *Phillips* specified in their contract that the purchased policy should be primary—no doubt the safer approach—no Texas court has held that such a label is required. Therefore, although these three cases inform the Court's ruling, the question is largely one that turns on basic principles of contract interpretation.

The ordinary and generally accepted meaning of "general commercial liability policy" is an important consideration. Federal and state courts in Texas commonly use the term "commercial liability policy" when referring to a primary policy and contrast such a policy with an "excess policy." *See RLI Ins. Co. v. Phila. Indem. Ins. Co.*, 421 F. Supp. 2d 956, 958–59 (N.D. Tex. 2006) (distinguishing a commercial liability policy, which the court defined as the "Primary Policy," and a commercial excess policy, which the Court defined as the "Excess Policy"); *Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 722 F. Supp. 2d 787, 791 (S.D. Tex. 2010) (distinguishing a commercial general liability insurance policy, which the court defined as the "Primary Policy," and an umbrella insurance policy, which the Court defined as the "Umbrella Policy"); *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 607 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (explaining that a party obtained "a commercial general liability ('GCL')

policy with a limit of $1 million for any one accident or occurrence and an umbrella policy with a $3.5 million limit for any one accident or occurrence"); *Employers Ins. Co. of Wausau v. Penn-Am. Ins. Co.*, 705 F. Supp. 2d 696, 700–01 (S.D. Tex. 2010) (seller agreed to purchase commercial general liability under which buyer was an additional insured; both parties treated the insurance that seller purchased as primary and seller's insurance defended the additional insured).[4] These judicial decisions' view that a "commercial general liability" policy is one providing primary coverage is consistent with the following basic test of ordinary meaning: if a business called an insurance broker and said "find me a general commercial liability policy," wouldn't the broker look for policies providing primary coverage? The Court believes the answer is "yes," and therefore concludes that the general understanding of the unmodified term "commercial general liability insurance" means primary coverage; the designation of "excess" or "umbrella" is expected to accompany a policy that provides coverage at higher layers.[5]

---

[4] Courts in other jurisdictions have focused on the importance of "additional insured" provisions. *See, e.g., Pecker Iron Works of N.Y. v. Traveler's Ins. Co.*, 786 N.E.2d 863, 864 (N.Y. 2003) (noting that when a contractor engaged a subcontractor and provided in writing that subcontractor would name the contractor as an additional insured, the subcontractor signified that the insurance that would be primary on the risk of the project was the subcontractor's, not the contractor's).

[5] Because of its ruling about the ordinary meaning of "commercial general liability policy," the Court need not consider Pac-Van's argument that CHS's obligation to pay Pac-Van's insurance "at its own expense," Docket Entry No. 12-1 at 3, would include not just the premium expense but also the self-insured retention amount.

10

This reading of the parties' agreement also finds support in *AmTech*'s rejection of an argument that would have made the obligation to provide "comprehensive liability insurance" illusory. 248 S.W.3d at 380. Just as requiring the additional insured in *AmTech* to reimburse the insurer for the "fronted policy" would have deprived the insured of its bargained-for coverage benefit, so too would allowing CHS to provide a policy in which Pac-Van has to cover the first $2 million of liability. As the $172,500 personal injury settlement that gave rise to this insurance dispute demonstrates, liability involving one of Pac-Van's trailers would rarely exceed $2 million. Furthermore, as its counsel conceded at oral argument on this motion, CHS's position would have allowed it to obtain a policy that did not provide coverage until $5 million, $10 million, or even $50 million worth of liability was incurred. Courts are to construe contracts "bearing in mind the particular business activity sought to be served and will avoid, when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312–13 (Tex. 2005) (internal citation and quotation marks omitted) (interpreting a lease provision to require that the lessee could only exercise a purchase option at the end of the lease term both because that construction was the only "reasonable interpretation of the lease" and also because a contrary holding would render the lease "unreasonable, inequitable, and oppressive"). This principle provides further support for

11

following the ordinary meaning of "general commercial liability policy" to mean one that provides primary coverage.

## IV. CONCLUSION

CHS purchased an excess policy that would not kick in until after Pac-Van had expended $2 million in its own defense. In few imaginable circumstances—perhaps only a wrongful death case—would this policy have actually covered any claim arising from the parties' agreement to lease Pac-Van's work trailer. For the reasons explained above, the Court finds that in contrast with the policy CHS actually purchased, CHS was obligated to purchase a primary commercial general liability policy that provided insurance up the first million dollars of liability. By failing to do so, CHS breached its contractual obligations to Pac-Van. Accordingly, CHS's Cross-Motion for Summary Judgment (Docket Entry No. 15) is **DENIED** and Pac-Van's Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED**.

**SIGNED** this 31st day of March, 2014.

_____
Gregg Costa
United States District Judge